## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

**GABRIELLE ALFANO FONTANA, as**
**Administrator of the Estate of M.F.**
4208 Rosemary Street
Chevy Chase, MD 20815

      and

**JOSEPH GABRIEL FONTANA, as**
**Administrator of the Estate of M.F.**
4208 Rosemary Street
Chevy Chase, MD 20815

      Plaintiffs**,**

      v.

**GROVE SCHOOL, INC.**
175 Copse Rd.
Madison, CT 06443

      and

**RICHARD CHORNEY**
175 Copse Rd.
Madison, CT 06443

      and

**PETER CHORNEY**
175 Copse Rd.
Madison, CT 06443

      and

**AMY STEVENS, M.D.**
175 Copse Rd.
Madison, CT 06443

      and

**SARAH HALLWOOD, LCSW**
175 Copse Rd.
Madison, CT 06443,

      Defendants.

Case No. _____

Date: September 19, 2022

## COMPLAINT AND JURY DEMAND

Come now Plaintiffs Gabrielle Alfano Fontana and Joseph Gabriel Fontana, as Co-Administrators of the Estate of M.F. (collectively, "Plaintiffs" or "Parents"), by and through undersigned counsel, and make this Complaint against Defendants Grove School, Inc. ("Grove or "Grove School"); Richard Chorney; Peter Chorney; Amy Stevens, M.D.; and Sarah Hallwood, LCSW (sometimes collectively, "Defendants"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

1.      This is an action, pursuant to this State's wrongful death and survival action statutes (Conn. Gen. Stat. §§ 52-555, 52-599, respectively), to redress damages from the tragic and untimely death of fifteen-year-old M.F., who died after being struck by a train on May 20, 2021, as a result of Defendants' breaches of applicable duties of care and use of unfair trade practices under Connecticut law.

## JURISDICTION, VENUE, AND PARTIES

1.      Plaintiffs Gabrielle Alfano Fontana and Joseph Gabriel Fontana are citizens of the State of Maryland.

2.      On June 22, 2021, the Register of Wills for Montgomery County, Maryland, appointed Plaintiffs as Personal Representatives of the Estate of M.F. On or about August 30, 2022, the Madison-Guilford Probate Court appointed Plaintiffs as Co-Administrators of the ancillary Estate of M.F.

3.      At the time of her death, M.F., also a citizen of the State of Maryland, was a fifteen-year-old student at Grove School.

4.      Defendant Grove School, a citizen of State of Connecticut, is a Connecticut corporation located at 175 Copse Road in Madison, Connecticut, and held itself out to the public as a "therapeutic boarding school" providing residential educational, medical, therapeutic, and psychiatric services to adolescents with social and emotional difficulties.

5.      At all relevant times to this Complaint, Richard Chorney ("R. Chorney"), a citizen of the State of Connecticut, was the President and CEO of Grove School and was an agent, owner, servant and/or employee of Grove School, and was acting within the scope of his employment and/or agency.

6.      At all relevant times to this Complaint, Peter Chorney ("P. Chorney"), a citizen of the State of Connecticut, was the Executive Director of Grove School and was an agent, owner, servant and/or employee of Grove School, and was acting within the scope of his employment and/or agency.

7.      Upon information and belief, at all times relevant to this Complaint, R. Chorney, P. Chorney, and/or other Grove School employees or agents were responsible for creating and implementing Grove School policies, procedures, advertising materials, and for the hiring, training, retention, and supervision of Grove School personnel.

8.      At all relevant times to this Complaint, Defendant Amy Stevens, M.D. ("Dr. Stevens"), a citizen of the State of Connecticut, was an employee and/or agent of Grove School and was M.F.'s psychiatrist while M.F. was enrolled at Grove School.

9.      At all relevant times to this Complaint, Defendant Sarah Hallwood, LCSW ("Ms. Hallwood"), a citizen of the State of Connecticut, was an employee and/or agent of Grove School and was M.F.'s therapist while M.F. was enrolled at Grove School.

10.     This Court has personal jurisdiction over Defendants in that the incident giving rise to this action occurred in Connecticut, Defendants are domiciled in Connecticut, and/or Defendants caused tortious injury by their acts and omissions in Connecticut. *See* Fed. R. Civ. P. 4(k); Conn. Gen. Stat. § 51-164s; Conn. Gen. Stat. § 52-57(a); Conn. Gen. Stat. § 52-59b.

11.     This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the jurisdictional amount exceeds $75,000 and no Plaintiff shares a state of citizenship with any Defendant.

12.     Venue over this matter is proper in this Court pursuant to 28 U.S.C. § 1391 because this Court has personal jurisdiction over Defendants, and because the events or omissions giving rise to Plaintiffs' claims occurred in Connecticut.

## FACTUAL BACKGROUND

### Admission to Grove School

13.     M.F. was born in 2005 to father Joseph G. Fontana ("Mr. Fontana") and mother Gabrielle A. Fontana ("Mrs. Fontana") (collectively, "Parents"). While she had previous struggles with anxiety, the COVID-19 pandemic had a significant impact on M.F.'s mental health. Around June or July of 2020, M.F. began receiving therapy and soon after was prescribed medication to treat her anxiety and depression.

14.     Prior to attending the Grove School, M.F. had been hospitalized at Suburban Hospital in Bethesda, Maryland on three occasions in 2020 in relation to panic attacks and self-harm.

15.     M.F. also received inpatient treatment at Dominion Hospital in Falls Church, Virginia from December 1, 2020, to December 12, 2020. Following in-patient treatment, M.F.

was admitted to a partial hospitalization program ("PHP") at Dominion Hospital on December 14, 2020, which continued until December 31, 2020.

16.     On July 24, 2020, Grove School submitted a COVID-19 "Reopening Plan" to the Connecticut Department of Education, which detailed social distancing plans, among other practices, and affirmed that "Grove School has worked to employ a full roster of staff and created a program plan that accounts for possible staff absences."

17.     At all relevant times, Grove School advertised on its website that it maintained a one-to-four teacher-to-student ratio.

18.     Following M.F.'s treatment at Dominion Hospital, M.F. was admitted to Newport Academy ("Newport") in Bethlehem, Connecticut, from January 15, 2021, to March 12, 2021. Newport's January 11, 2021, Suicide and Risk Assessment for M.F. reflected four suicide attempts, the most recent occurring on December 20, 2020. M.F.'s Discharge Summary from Newport noted that M.F.'s underlying issues were still present and that she continued to experience self-harm, suicidal ideation, and anxiety. The Discharge Summary further noted that M.F. had gone missing, or "AWOL," on multiple occasions.

19.     Following her inpatient stay at Newport, M.F. was admitted to a partial hospitalization program at the Newport Academy in Rockville, Maryland. M.F. participated in this program from March 18, 2021, through April 14, 2021. Newport's March 22, 2021, Biopsychosocial Assessment for M.F. reflects that she stated, "I've tried to kill myself four times, it's so pathetic that I failed all four." She further stated that she always has some sort of plan as to how she would kill herself, noting, "I'd probably jump off a bridge or jump in front of a car."

20.     On or about March 15, 2021, M.F.'s Parents submitted an Application for Admission (the "Application") to the Grove School, citing M.F.'s depression and anxiety as the reason for seeking treatment at Grove School. As part of the admission process, the Parents submitted the written Application and provided Grove School with medical, psychiatric, hospital, and academic records documenting M.F.'s psychiatric impairments and behavioral problems in addition to her academic reports.

21.     Among other information, M.F.'s Application included information regarding her "[m]inor self-harm in the last 3 months of 2020," her "[t]houghts of worthlessness and suicide in 2020," and past struggles with depression and anxiety.

22.     On or about March 24, 2021, Grove School sent M.F. and her Parents a Letter of Acceptance, which required that M.F.'s "[m]edical records [] be completed and returned before admission date." The Letter of Acceptance further indicated that "[i]f additional information is received and/or if behavior is evidenced contrary to that discussed on the records, and during the time of interview, [Grove School reserves] the right to re-evaluate [its] decision."

23.     As outlined in the Grove School Student/Parent Handbook (the "Handbook"), prior to admission, a "Letter and/or treatment summary from Current Therapist and Psychiatrist," "Most Recent Neuro-psych Testing," and "All Hospital Discharge Summaries" must be completed and submitted to Grove School staff.

24.     Pursuant to the Master Contract for Residential Education Facility Services (the "Contract"), entered into between the Parents and Grove School, "[Grove School,] following a pre-placement suitability interview and record review, shall admit [M.F.] as a student of [Grove School], and will provide [M.F.] with services set forth herein . . . suitable to [M.F.'s] needs and capabilities." The Contract further stated that, "[i]n the event that [Grove School] determines that

[M.F.'s] placement at [Grove School] is no longer in the best interests of [Grove School], [M.F.],

or where [M.F.] represents a danger to himself/herself or others . . . [Grove School] shall . . .

suspend [M.F.] from attendance at [Grove School]."

25.    Pursuant to the Handbook, the following, among other, information was required

on or before entry into Grove School: "Letter and/or treatment summary from Current Therapist

and Psychiatrist," "Most Recent Neuro-psych Testing," and "All Hospital Discharge

Summaries."

26.    The Parents fully satisfied all of Grove School's admission requirements.

27.    After reviewing M.F.'s medical, hospital, psychiatric, and other records, Grove

School determined that M.F. was appropriate for admission to its program and that it could

adequately and safely provide for her educational and psychiatric needs.

28.    Grove School charged an annual residential student tuition of $144,000.00 for its

services.

29.    As described in the Handbook, Grove School accepted students who present with

the following issues:

ADD/ADHD
Non-Verbal Learning Disability
Attachment Disorders
Anxiety
Autism Spectrum Disorders
Borderline Personality Disorder
Eating Disorders
Learning Disabilities – mild to moderate
Mood Disorders

Adjustment Disorders
Post Traumatic Stress Disorder
Obsessive Compulsive Disorder
Oppositional Defiant Disorder
Pervasive Developmental Disorder
Relational Problems
Tourette's Syndrome
Truancy and School Phobia

30.     Grove School claimed to not accept children who are:

Delinquent
Excessively disruptive
Actively Suicidal or
Severely Self Injurious

Chronic Runaways
Violent
Sex Offenders

Actively Psychotic
Dependent Substance Abusers
Fire Setters

31.     As described in the Handbook, Grove School assigned M.F. an advisor, therapist, and psychiatrist.

32.     Grove School policy provided that "Psychiatrists are in frequent contact with both the therapist and the advisor and are updated on any important information. Parents will be contacted by the psychiatrist *prior* to any medication change."

33.     Grove School placed M.F. in a dorm, which, pursuant to the Handbook, was to be "directly supervised by two dorm staff." According to the Handbook, at any given time, an Administrator on Duty ("AOD") was to be responsible for the management of the campus, and, at the end of the evening, the AOD would compile a report referencing any incidents, issues, or emergencies. In the Handbook, Grove School also claimed to employ security staff who would monitor the campus at all times. The Handbook further described an overnight security group on campus that monitored the status of each dorm and an administrator that was to be on call for each overnight shift in the event they were needed.

8

34.     The Handbook proscribed that "[a]ll girls' dorms are staffed by the on-duty staff who sleep in their room and are available as needed. These dorms are also assigned an awake female night watch staff. This staff maintains contact with the night security personnel throughout the evening."

35.     Furthermore, Grove School used a "Check-in Status" system to supervise all students. The Handbook explained that new students remain on "Supervision Status" for at least two weeks after admission to Grove. New student supervision requires students to "always be with staff excluding time spent in their assigned bedrooms or bathroom," among other limitations/supervision. After the two-week period, students may discuss a change in status with their advisor and request a "Check-in Status Form." If approved, "Check-in status increases in fifteen-minute increments until students earn 'Downtown' status."

36.     Pursuant to the Handbook, "[s]tudents remain on supervision for a minimum of two weeks," after which students may upgrade their check-in status to "15s," whereby they "[m]aintain consistent timelines of checking in every 15 minutes . . .." and must remain on "15s" for a minimum of four weeks.

37.     Following "15s," a student's check-in status may be upgraded progressively to 30-minute, 45-minute, and hourly check-ins. Finally, a student may earn "Downtown Privileges," only requiring the student to "check in with their dorm staff and then the AOD on days they would like to go downtown . . .."

38.     Upon information and belief, M.F. never progressed beyond "15s."

39.     The Handbook references an elevated level of supervision called "Escorted Supervision," which required "[s]tudents [to] be with Grove Staff at all times including being

walked to meals, activities, and classes . . .[and] [s]tudents may need to sleep under the direct supervision of a 24 hour overnight awake staff."

40.     Upon information and belief, Grove School policy was to have a student on Escorted Supervision stay overnight in the common area of the dorm and with a staff member.

41.     Additionally, Grove School policy outlined another elevated level of supervision called "AOD Eyesight," which required that students be with an AOD at all times and remain in the Welcome Center. Furthermore, students placed under AOD Eyesight supervision were prohibited from attending on or off campus activities and must sit with the AOD at meals. As with Escorted Supervision, "[s]tudents may need to sleep under the direct supervision of a 24 hour overnight awake staff."

42.     Grove School's "Night Staff and Night Watch Job Expectations Manual" (the "Night Shift Manual") described the job expectations for staff working the 3rd (overnight) shift. The Night Shift Manual prescribed that "Students should be checked in the female dorms every 30 minutes unless specified" and that night staff "should be stationed in the lounge of the dorm [they] are assigned to unless otherwise specified."

43.     As reflected in bed-check forms, it was Grove School policy to perform bed checks on all students every 30 minutes from 11:00 p.m. until 3:00 a.m., and then 45-minute bed checks from 3:00 a.m. until 6:00 a.m.

44.     Upon information and belief, Grove School policy was that a proper bed check involved confirming that the staff member could see the skin of, or movement from, the student. The Night Shift Manual described "non-intrusive" bed checks with the goal of confirming the student is in bed without waking her up.

<u>Early Concerns for M.F.'s Safety at Grove School</u>

45.     Grove School staff raised concerns about M.F.'s ability to be safe at Grove as soon as her first day on campus, April 19, 2021. That day, M.F. and Mrs. Fontana met with Grove School staff for an intake meeting (the "Intake Meeting"). Following the Intake Meeting, Ms. Hallwood, M.F.'s therapist at Grove, noted M.F.'s "past [homicidal ideation (HI)] and [suicidal ideation (SI)] and past self-harm (21 days ago)" and further noted that M.F. had four previous suicide attempts, three of which occurred during M.F.'s stay at the "Newport Academy." Ms. Hallwood's notes for the April 19, 2021, Intake Meeting were created over a month later, on May 31, 2021, after M.F.'s death, and are incorrect with respect to M.F.'s suicide attempts occurring while at Newport.

46.     Ultimately, Ms. Hallwood's notes following the Intake Meeting reflect that she was "concerned about [M.F.'s] ability to stay safe on campus" and that she arranged a meeting with Dr. Stevens, M.F.'s psychiatrist at Grove, and Nancy Darr ("Ms. Darr"), Assistant Clinical Director at Grove, to discuss her concerns.

47.     Mrs. Fontana, who was present at the Intake Meeting, expressed that M.F. works well with a plan outlining individuals she can reach out to if she starts feeling anxious. Venessa Truglio ("Ms. Truglio"), M.F.'s academic advisor at Grove, assured Mrs. Fontana that she would work with M.F. to have a plan for when she starts feeling anxious.

48.     Similarly, Dr. Stevens prepared notes for M.F. immediately following the Intake Meeting. In her summary, Dr. Stevens noted that M.F. "has had one hospitalization, summer of 2021, for suicidal ideation . . . [and that] [s]he had suicidal impulses that led to gestures that were interrupted on at least two occasions."

49.    The following day, on April 20, 2021, Ms. Hallwood emailed Ms. Truglio, Dr. Stevens, and Mike Black, Director of Transition Program at Grove, about having a meeting to discuss M.F.: "[g]iven yesterday's intake and the information we gathered, I am wondering if we should get M.F. on the roster for proactive meeting."

50.    On April 21, 2021, Ms. Darr sent an email to staff raising "initial concerns with [M.F.]."

51.    On April 22, 2021, M.F. experienced an episode where she suddenly felt an impulsive urge to walk around with a rabbit, which she then took from the farm on Grove School's campus. Following this incident, the AOD noted that M.F. "mentioned a 'safety plan' that was put in place at Newport. Stated that this was helpful but could not articulate what this looked like. Expressed feeling 'surprised' that Grove didn't 'care' to make one for her yet."

52.    On April 23, 2021, after contacting M.F.'s prior therapist at Newport Academy, Ms. Hallwood noted that she was "[g]oing to follow up with [Ms. Darr] to express concerns about [M.F.'s] safety at Grove." Ms. Hallwood asked the therapist if she "would worry about [M.F.] having unsupervised access to razors" to which the therapist responded, "I would not feel comfortable with [M.F.] having razors unsupervised."

53.    That same day, Ms. Truglio sent an email to staff asking them to be "mindful that [M.F.] has begun to demonstrate some provocative and risky language as well as behavior." Ms. Truglio continued, "[p]lease communicate with AODs immediately if you experience any interaction with [M.F.] or overhear any communication from [M.F.] that seems to be risky, provocative, or unsafe. As a new student, she remains on supervision."

54.    The next day, April 23, 2021, Ms. Truglio sent a "Support Plan" for M.F. to various Grove School staff, including Dr. Stevens and Ms. Hallwood. The Support Plan outlined

information regarding communication and coping mechanisms and served as the "safety plan" M.F. and her Parents had requested.

55.    Until at least May 4, 2021, Ms. Hallwood was unable to enter notes regarding M.F., writing to Ms. Darr that "I do not yet have access to add notes to [M.F.'s] . . . profile."

56.    On May 5, 2021, Ms. Hallwood noted that M.F. "appeared to be covering up feelings of depression with laughing and smiling."

57.    On or about May 6, 2021, Dr. Stevens reported that M.F. "frequently has [suicidal ideation] and weeks ago decided that if she ever harmed herself at Grove it would be a specific plan that she did not share with this author." Dr. Stevens further noted that she "met with M.F. together with her therapist [Ms. Hallwood] in the context of statements M.F. had made about suicidal ideation and how historically she always has some plan about how she would self-harm" and that M.F. said "she lies frequently but agreed to not engage in that behavior at Grove."

58.    That day, Dr. Stevens also made a change to M.F.'s medication. However, the Parents only learned of this change the next day, May 7, 2021, through a conversation with M.F. After Mrs. Fontana confronted Dr. Stevens about this contravention of Grove School policy, Dr. Stevens apologized to Mrs. Fontana during a phone call on May 10, 2021.

59.    On May 7, 2021, the AOD reported that M.F. had an episode during which she stood on a table and attempted to climb on the roof of the dining hall, claiming she "had to sit on the roof." She later jumped off the table and started to quickly walk through the parking lot. Eventually, she sat down on the pavement, rocking back and forth, hyperventilating and screaming "you can't take me" repeatedly while hitting her legs. After about 10 minutes she stopped and said the police officers were there to take her. The Grove School staff member

assured her that there were no police officers. M.F. then abruptly stood up and said, "I'm going back to my dorm."

60.     Upon information and belief, Grove School staff gave M.F. medication following the May 7, 2021, incident and did not inform her Parents about the incident or the administration of the medication until two days *later*.

61.     On May 13, 2021, Ms. Hallwood reported that M.F. "displayed gamey behavior with answering safety questions . . .." That day, Dr. Stevens sent an email to Ms. Hallwood and Ms. Truglio stating that,

> [Ms. Hallwood] and I spoke and concluded that M.F.'s parents need to be
> aware of how closely she is walking the line between appropriate [G]rove
> behavior and unsafe behavior/speech where she might need to go elsewhere
> . . . I spoke with [Mrs. Fontana] and explained that behavior like that which she
> displayed this weekend could easily result in a hospitalization (in addition to
> her language around suicide). Hopefully the two of you can reinforce that
> message. They want a 'safety plan' so I'll leave that to you. I just don't want
> them to be shocked when she is hospitalized because they seem easily upset
> when their expectations are not met.

62.     Prior to May 19, 2021, neither Dr. Stevens nor any other Grove School staff member *ever* explained to Mr. or Mrs. Fontana that M.F. may require a higher level of care than Grove School was able to provide.

63.     On May 17, 2021, Mr. Fontana received a text from one of M.F.'s friends, warning Mr. Fontana that M.F. said something to her that made her worried about M.F.'s safety. Mr. Fontana called Grove and told them about the text, and to keep an eye on M.F.

64.     That same day, Ms. Hallwood noted that M.F. reported "feelings of depression" and noted again that M.F. had "game like answers around safety."

<u>May 19, 2021, the Day Before M.F.'s Death</u>

65.    Two days later, on or about May 19, 2021, the Grove School placed M.F. on Escorted Supervision.

66.    Around 10 a.m. on May 19, 2021, Ms. Hallwood reached out to M.F.'s Parents to set up a call between herself, Dr. Stevens, and the Parents around 12:15 p.m. that day. During the conversation, Ms. Hallwood and/or Dr. Stevens noted that M.F. had made mention of "train tracks," that they had concerns about M.F.'s safety, and that Grove School had put M.F. under Escorted Supervision. Ms. Hallwood and/or Dr. Stevens assured Parents that M.F. would be constantly accompanied by a staff member. The Parents agreed to have a call with M.F., Dr. Stevens, and Ms. Hallwood at 10:30 a.m. the next morning.

67.    Also on May 19, 2021, Dr. Stevens reported in her notes that M.F. was experiencing "[s]uicidal ideation with plan that she says she repeatedly does not act on." Dr. Stevens further noted that M.F. "says she is having occasional suicidal thinking but none in the last 24 hours. She says that it occurs primarily between 5pm and 9pm. She says that she feels 'super depressed' at that time."

68.    On May 27, 2021, one week *after* M.F.'s death, Dr. Stevens wrote an addendum to her May 19, 2021, note stating that ". . . prior to assessment there had been concern on a previous visit to therapist of something said about the fact that if we could read her mind we might hospitalize her or take certain privileges away." Dr. Stevens further noted in her addendum that M.F. "had said in a visit weeks prior with her therapist that she was the kind of person that always knew how she would kill herself if she ever did it and she had mentioned something about train tracks in that conversation."

69.     Mike Black's notes from the May 19, 2021, staff meeting discussed "keeping [M.F.] close to staff and using hospital as intervention if behaving or talking in an unsafe way." During the May 19, 2021, "proactive intervention," Mr. Black wrote, "Team will highlight to family that there are concerns about the placement and begin exploring other options."

70.     By email on May 19, 2021, Ashley Page, Grove's Assistant Residential Director, informed Grove staff that "[M.F.] is on escort supervision for safety reasons. She needs to be walked from place to place on campus. [M.F.] is allowed to attend local off-campus activities that are structured (i.e., Tennis) if she is closely monitored by staff. [M.F.] will need to have an additional staff member present when attending the Hobby Farm."

71.     The night staff for the evening of May 19, 2021, included Amelia Dupree, Jacquese Patterson, Molly Vanweren, and Mary Zacarelli.

72.     Amelia Dupree was assigned to the following girl's dorms: Yellow House, Olshin House, and Tessler House.

73.     Jacquese Patterson was assigned to the Transition House, an off-campus dorm across the street from Grove School campus.

74.     Molly Vanweren ("Ms. Vanweren") was assigned to the Welcome Center, where she was responsible for watching the cameras and was *also* responsible for conducting the bed checks for the *six* boy's dorms. No one was assigned to or responsible for watching the cameras while Ms. Vanweren performed and documented the bed checks.

75.     Mary Zacarelli ("Ms. Zacarelli") was assigned to the following three girl's dorms: Charles House, Middle House, and Emmerich House, M.F.'s dorm. Ms. Zacarelli was aware that M.F. was on Escorted Supervision earlier that day and therefore was stationed at Emmerich

House (i.e., she was to stay at Emmerich House while not performing bed checks at the other dorms).

<u>May 20, 2021, the Day of M.F.'s Death</u>

76.     On May 20, 2021, at approximately 5:10 a.m., Officers Jeremy Yorke and Robert Lazaroff of the Madison Police Department ("MPD") were dispatched to the railroad tracks located in the area of Railroad Avenue and Wall Street for a report of a person struck by a train.

77.     There, MPD officers found what they later determined to be the remains of M.F. Based on the age of the deceased girl, and "due to past police encounters," officers from the MPD went to the Grove School to check if there were any missing students.

78.     At about 6:00 a.m., MPD officers arrived at the Grove School Welcome Center. A short time later, P. Chorney advised the officers that M.F. was missing. Eventually, R. Chorney arrived at the Welcome Center and advised the MPD officers that he notified Mr. Fontana that M.F. was missing, and that one of Mr. Fontana's first sentences was, "did you check the railroad tracks?"

79.     The Amtrak Police Department ("APD") conducted the lead investigation. On May 20, 2021, Robert Hanson ("Detective Hanson"), a detective for the APD, met with Peter and/or Richard Chorney at Grove School. Detective Hanson asked about the accountability practices for students overnight and Peter and/or Richard Chorney stated that residential staff checked on students every 45 minutes. Peter and/or Richard Chorney also stated Grove School staff accounted for M.F. at 4:00, 4:45, and 5:30 a.m.

80.     Grove School security camera footage shows M.F. leaving her dorm at or around 4:09 a.m. on May 20, 2021. M.F. was also captured on at least three other security cameras as she walked off Grove School campus and towards the train tracks.

81.     As such, Grove School staff, specifically Ms. Zacarelli, who marked M.F. as asleep and in bed at 4:45 a.m., claimed to have accounted for M.F. over 35 minutes *after* she had left the dorm.

82.     Indeed, the Emmerich Night Staff Report from May 19, 2021, which was falsely filled out by Ms. Zacarelli and provided for bed checks from 11:00 p.m. on May 19, 2021, to 6:45 a.m. on May 20, 2021, has an "S," for "sleeping," next to every bed check for all seven students, including M.F.

83.     As such, not only did Ms. Zacarelli falsely mark M.F. as sleeping *after* she (M.F.) had left the dorm, but she also marked her as sleeping *after* she had been tragically struck by a train and killed.

84.     Furthermore, the Emmerich Night Staff Report from May 19, 2021, notes that M.F. was "put on escort today," reflecting the Dorm and Night Staffs' awareness of M.F.'s need for heightened supervision.

85.     Detective Hanson then inspected M.F.'s dorm room and observed a window screen missing from an unlocked window directly next to M.F.'s bed. While Detective Hanson was at the Grove School, Dr. Stevens told him that all the students knew of the railroad tracks and highway and occasionally Grove would have students go missing from campus. Dr. Stevens also mentioned to Detective Hanson that there was an incident *two weeks prior* when a student left campus and was located near the railroad tracks. Dr. Stevens also recalled to Detective Hanson that about *two weeks prior*, M.F. had made a comment that if she was going to harm herself, *she would go to the train tracks*.

86.     Detective Hanson received a copy of the Grove School's security camera footage, which showed, first, around 4:09 a.m., M.F. walking from the front yard of her dorm to the

roadway. No Grove staff intervened. The camera footage then showed her walking south past the "Patch Cross walk" camera, and later walking south by the main entrance on Copse Road. No Grove staff intervened. Additional camera footage, labeled "Yellow House," also captured M.F. leaving campus. Again, no Grove staff intervened.

87.     Based on the investigation, Detective Hanson concluded that: (1) M.F. was a flight risk from the school, (2) Grove placed her on Escorted Supervision status knowing this, and (3) the nighttime staff on the morning hours of May 20, 2021, were "*negligent in the supervision and accountability* of her on 2 bed checks both at 4:45 am and 5:30 am."

88.     As Detective Hanson noted, "[t]he bed checks have the sole purpose of ensuring her safety and a timely reporting to police should any resident go missing. This resulted in a 60-minute window where [M.F.] was unaccounted for thus resulting in her walking to the Amtrak railroad tracks where she . . . stood in front of Amtrak Train 66."

89.     As Detective Hanson reported, Grove School "was not aware [M.F.] was missing until after police had responded to the scene and the investigation had begun."

<u>Following M.F.'s Death</u>

90.     On May 24, 2021, Mr. Fontana visited the Grove School to pack up M.F.'s belongings. While on the Grove campus, R. Chorney requested a conversation with Mr. Fontana, to which Mr. Fontana agreed. Mr. Fontana asked R. Chorney how M.F. could have been left alone at night while under heightened supervision, which Mr. and Mrs. Fontana understood would ensure M.F.'s safety by having a Grove School staff member with M.F. at all times. R. Chorney *admitted* that one of his staff members didn't follow protocol by bringing M.F. into the common area to sleep. Upon further questioning, R. Chorney also *admitted* that, due to short staffing, Ms. Zacarelli was not even *able* to stay in the common area the whole night.

91.     Short staffing and mismanagement made adherence to Grove School policy and protocol an impossibility.

92.     Mr. Fontana also raised the issues of poor management and lack of accountability with R. Chorney. When M.F. arrived at Grove, her dorm room had not been cleaned from the time the previous student lived there. M.F. had to clean it herself. On several occasions, after hearing complaints from M.F. regarding cleanliness in the dorms, the Parents reached out to Grove School staff to ensure the facilities were properly cleaned. Mr. Fontana explained that Colin Davies, Associate Executive Director at Grove School, had told him that Grove staff was to clean the dorms daily, but did not know who, if anyone, was responsible for verifying that the required cleaning actually happened. At one point, Mrs. Fontana drove from Maryland to Connecticut and took M.F. to purchase cleaning supplies so that M.F. could clean her bathroom and dorm room herself. This interaction, along with the failures to notify the Parents of changes to M.F.'s medication beforehand, is indicative of the pervasive lack of management and accountability at Grove School.

93.     R. Chorney's admissions to Mr. Fontana were corroborated by Detective Hanson's investigation. Detective Hanson supplemented his report on May 24, 2021, indicating that he spoke further with Grove staff and learned that when someone is placed on Escorted Supervision status, Grove policy was to have the student stay in the *common area of the dorm* and *with a staff member*. Detective Hanson also learned that Grove was very short-staffed – a phenomenon that had apparently been going on for many months – and that the night staff were covering two extra dormitories. Finally, a Grove School staff member informed Detective Hanson that their procedure when a student goes missing is to search the grounds first before

alerting authorities. If Grove staff are unable to locate the student, Grove then contacts the police.

94.     As Detective Hanson informed Mr. Fontana, had MPD or APD been notified that M.F. was missing, Amtrack would have stopped all trains traveling through Madison until M.F. was found.

95.     The Connecticut Department of Education (DOE) required special education programs, including that offered by Grove School, to immediately notify DOE of any conditions "that might significantly alter the program and/or health and safety of the students." Upon information and belief, Grove School never notified the DOE regarding its staff shortage or its decision to have dormitories unstaffed at times during the overnight shift.

96.     The DOE also required that Grove School, "[f]or each student who is being considered for admission or has been admitted to the special education program and who presents serious disruptive behavior, [] review[] the students [Individualized Education Program (IEP)] to ensure that it contains suitable provisions for managing the student's behavior, including provisions for sufficient staffing and supervision to prevent, with reasonable assurance, harm by the student to self or others, and provisions for appropriate monitoring and review of the student's emotional and behavioral status." Upon information and belief, Grove School never sent a request to M.F.'s school district that a Planning and Placement Team (PPT) meeting be convened in order to address any concerns with her IEP.

97.     This policy of searching the campus first, in the context of a student suffering from suicidal ideation and talking about train tracks, is irrational and dangerous. In a misguided attempt to argue that, even if the 4:45 a.m. bed check had been performed properly, M.F. would likely not have survived, R. Chorney explained this irrational policy to Mr. Fontana.

98.     The next day, May 25, 2021, Detective Hanson conducted additional interviews with Grove staff, which further confirmed the Grove School's negligent understaffing. This time, a nighttime staff worker reported that on some nights she was responsible for boys' dorms, girls' dorms, *and* cameras (located in the Welcome Center) because of the lack of staffing. This staff member recalled that at one point, before the understaffing issues, there was a nighttime staff worker for each dorm and two in the Welcome Center.

99.     On May 27, 2021, the Department of Children and Families (DCF) sent a letter to R. Chorney stating that, "[i]n the course of [its] investigation[,] information about the third shift staffing has been discovered which is of a concerning nature. Specifically, it was learned that more than half of the resident dorms do not have an awake staff member present during the overnight hours. In light of the recent tragedy, the Department believes that this level of staffing is inadequate and is hereby requiring that Grove School implement a staffing plan which will require a minimum of one awake staff member in all residential dorms during third shift. Until Grove School is able to implement this staffing plan, no new admissions should occur."

100.     On June 2, 2021, Detective Hanson conducted a follow-up interview with Ms. Zacarelli, which had been delayed due to the Grove School suspending her immediately after the incident. Detective Hanson reported that Ms. Zacarelli was *unfamiliar* with Escorted Supervision and the process for dealing with a missing student.

101.     Upon information and belief, Grove School failed to properly train its staff, including Ms. Zacarelli, regarding the supervision of students and the procedure for dealing with missing students.

102.    Beginning around May 21, 2021, the State of Connecticut Department of Children and Families ("DCF") began an investigation into M.F.'s death. Ultimately, DCF substantiated claims of "physical neglect" against Ms. Zacarelli.

103.    Under Conn. Gen. Stat. § 46b-120(4), "[a] child may be found 'neglected' who, for reasons other than being impoverished, (A) has been abandoned, (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child."

104.    Under Conn. Gen. Stat. § 53-21, it is a class C felony to "willfully or unlawfully cause[] or permit[] any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired . . .."

<u>Prior Incidents</u>

105.    M.F. was far from Defendants' first student to struggle with suicidality and/or go missing from campus.

106.    In January of 2005, the MPD responded to the report of a student who had jumped from the roof of the Grove School's dining hall. Searching the student's living area, MPD officers located a 10-page suicide letter. The student was taken to Yale New Haven Hospital and pronounced dead later that day.

107.    In April of 2012, the MPD was dispatched to Grove School for a missing seventeen-year-old female student who left Grove School without permission at or about 10:00 p.m. The student returned on her own, about an hour-and-a-half later but reported that she had also left campus earlier in the day without permission and returned on her own. Upon

information and belief, Grove School did not contact the police when the student left campus earlier that day.

108.    Similarly, in November of 2014, a sixteen-year-old female student left Grove School campus without permission. Madison police were able to locate the student roughly 30 minutes after a Grove School staff member approached an officer in a CVS parking lot.

109.    In August of 2015, a Grove School Administrator reported to the MPD that a male student, who had expressed the desire to hurt himself that night, had gone missing. The school Administrator stated that he believed the student was headed for the highway or train station. The MPD officer found the student by the I-95 on-ramp and brought the student to Yale New Haven Hospital.

110.    In April of 2018, the MPD was again dispatched to the Grove School on a report of a missing person, this time a seventeen-year-old female student. The student had contacted her father, who informed the Grove School's Associate Director of her location. The Connecticut State Police were able to locate the student, but the Associate Director stated that Grove School would not accept the student and that her parents would have to pick her up.

111.    In November of 2019, MPD was dispatched to Grove School regarding a complaint of a seventeen-year-old female student who exited out of the first-floor dorm window, jumped into an awaiting vehicle, and departed. The Grove School informed MPD that the student suffered from depression, anxiety, bipolar disorder, and suicidal thoughts. The student's mother reported that her daughter was having a difficult time at school by not having a psychologist readily available to speak with. The student ultimately returned home.

112.    In March of 2020, Grove School staff again contacted MPD to report a student who had run away from campus. The student, who returned to campus on her own, stated that

she was currently suicidal and had attempted suicide seven times prior to attending the Grove School. The MPD transported the student to Yale New Haven Hospital for further evaluation.

113.    As mentioned above, just *two weeks* prior to M.F.'s death, a student had gone missing from Grove School campus and was located near the railroad tracks.

## COUNT I
### Wrongful Death - Negligence
### All Defendants
### (Conn. Gen. Stat. § 52-599, Conn. Gen. Stat. § 52-555)

114.    Paragraphs 1-113 are incorporated herein by reference as though fully set forth herein.

115.    At all relevant times, Defendants owed M.F., a minor child, a duty of care because of Defendants' undertaking in providing her with care and treatment.

116.    Defendants adopted policies and protocols regarding supervision and restricting students' freedoms to address the specific harm that occurred, namely self-harm and suicide.

117.    Defendants had undertaken to prevent suicide and/or self-harm by placing M.F. on Escorted Supervision status, among other supervision and security measures.

118.    There existed a special relationship of custody and control between M.F. and Defendants, as Defendants maintained complete control over M.F.'s academic, mental, and physical welfare.

119.    M.F., a fifteen-year-old girl suffering from severe depression and anxiety, was particularly vulnerable and dependent upon Defendants, who held considerable power over her welfare.

120.    Defendants had actual knowledge of M.F.'s prior suicide attempts as well as the details of her then-current suicidal ideation.

121.    Defendants had actual knowledge that M.F. was contemplating committing suicide on the very train tracks where she ultimately carried out her plans.

122.    M.F.'s death was a foreseeable outcome of Defendants' negligent failure to account for her generally, and particularly while she was on Escorted Supervision.

123.    Defendants knew or should have known that they were unable to properly care for M.F., yet chose to admit her, allowed her to remain admitted, failed to hospitalize her, failed to adequately supervise her, and failed to take other reasonable steps to ensure her safety. These defendants, in what can only be described as financial greed, chose to place vulnerable children, including M.F., at high risk by accepting students while affirmatively cutting corners by short-staffing the school so as to make more money.

124.    M.F.'s death was caused by and was the direct and proximate result of Defendants' negligence.

125.    But for Defendants' negligence in failing to properly administer Grove School policies, or otherwise taking reasonable action to prevent M.F. from self-harming or committing suicide, M.F. would not have died on May 20, 2021.

126.    At the time of her death, M.F. was fifteen years old, in good health, and had a normal life expectancy of over sixty more years. As a result of her death, M.F.'s ability to engage in and enjoy her normal life's activities for the remainder of her normal life expectancy was destroyed.

127.    As a further result of her death, M.F.'s future earning capacity was destroyed.

128.    As a result of M.F.'s death, her Estate incurred funeral expenses.

129.    Defendants are liable to the Estate of M.F. for her wrongful death and damages caused by their negligence and the negligence of their administrators, counselors, and other staff.

## COUNT II

**Wrongful Death - Negligent Supervision**

**Defendants Grove School, Richard Chorney, and Peter Chorney**

**(Conn. Gen. Stat. § 52-599, Conn. Gen. Stat. § 52-555)**

130.    Paragraphs 1-129 are incorporated herein by reference as though fully set forth herein.

131.    At all relevant times, Ms. Zacarelli was an employee of Grove School.

132.    Grove School, P. Chorney, and/or R. Chorney had a duty to supervise all staff, including those responsible for watching over Grove School students.

133.    Grove School, P. Chorney, and/or R. Chorney knew or should have known that there was a systemic and structural lack of accountability at Grove.

134.    Grove School, P. Chorney, and/or R. Chorney knew or should have known that Grove staff cut corners and were unable to adequately adhere to Grove School's policies and procedures due to severe understaffing and lack of training. These defendants, in what can only be described as financial greed, chose to place vulnerable children, including M.F., at high risk by accepting students while affirmatively cutting corners by short-staffing the school so as to make more money.

135.    Grove School, P. Chorney, and/or R. Chorney knew or should have known that Grove School staff's inability to administer adequate supervision over students, particularly students placed on Escorted Supervision status, would lead to the type of injury M.F. suffered.

136.     As a result of Grove School, P. Chorney, and/or R. Chorney's failure to properly supervise Grove School staff, including Ms. Zacarelli, M.F. suffered the very type of injury properly supervised staff would have prevented.

137.     At the time of her death, M.F. was fifteen years old, in good health, and had a normal life expectancy of over sixty more years. As a result of her death, M.F.'s ability to engage in and enjoy her normal life's activities for the remainder of her normal life expectancy was destroyed.

138.     As a further result of her death, M.F.'s future earning capacity was destroyed.

139.     As a result of M.F.'s death, her Estate incurred funeral expenses.

140.     Defendants Grove School, Richard Chorney, and Peter Chorney are liable to the Estate of M.F. for her wrongful death and damages caused by their negligent supervision and of their administrators, counselors, and other staff's negligent supervision.

## COUNT III
### Wrongful Death - Negligent Training
### Defendants Grove School, Richard Chorney, and Peter Chorney
### (Conn. Gen. Stat. § 52-599, Conn. Gen. Stat. § 52-555)

141.     Paragraphs 1-140 are incorporated herein by reference as though fully set forth herein.

142.     At all relevant times, Ms. Zacarelli was an employee of Grove School.

143.     Grove School, P. Chorney, and/or R. Chorney failed to properly train staff, including Ms. Zacarelli, as to proper procedures regarding Escorted Supervision.

144.     Grove School, P. Chorney, and/or R. Chorney failed to properly train staff, including Ms. Zacarelli, as to proper procedures in the event of a missing student.

145.    Grove School, P. Chorney, and/or R. Chorney knew or should have known that failing to properly train employees regarding supervision/missing student policies and procedures could foreseeably result in the type of injury suffered by M.F.

146.    As a result of Grove School, P. Chorney, and/or R. Chorney's failure to properly train staff, M.F. suffered the very type of injury properly trained staff would have prevented.

147.    At the time of her death, M.F. was fifteen years old, in good health, and had a normal life expectancy of over sixty more years. As a result of her death, M.F.'s ability to engage in and enjoy her normal life's activities for the remainder of her normal life expectancy was destroyed.

148.    As a further result of her death, M.F.'s future earning capacity was destroyed.

149.    As a result of M.F.'s death, her Estate incurred funeral expenses.

150.    Defendants Grove School, Richard Chorney, and Peter Chorney are liable to the Estate of M.F. for her wrongful death and damages caused by their negligent training and of their administrators, counselors, and other staff's negligent training.

## COUNT IV

**Wrongful Death - Medical Malpractice**

**Defendants Amy Stevens, MD; Sarah Hallwood, LCSW; and Grove School**

**(Conn. Gen. Stat. § 52-599, Conn. Gen. Stat. § 52-555)**

151.    Paragraphs 1-150 are incorporated herein by reference as though fully set forth herein.

152.    Pursuant to Conn. Gen. Statute § 52-190a, attached hereto is a certificate of Plaintiffs' counsel stating that a reasonable inquiry gives rise to a good faith belief that grounds exist for an action against Dr. Stevens (**Exhibit 1**) and written and signed opinion letters from

similar health care providers stating that there appears to be evidence of medical negligence and providing the detailed bases for the formation of that opinion (**Exhibits 2 and 3**).

153.    Given what Dr. Stevens and/or Grove School knew or should have known about M.F., the psychiatric services provided by Dr. Stevens and/or Grove School to M.F. prior to her death by suicide did not meet the standard of care for a psychiatrist treating a student at risk for suicide.

154.    Given what Ms. Hallwood and/or Grove School knew or should have known about M.F., the therapy services provided by Ms. Hallwood and/or Grove School to M.F. prior to her death by suicide did not meet the standard of care for a licensed clinical social worker treating a student at risk for suicide.

155.    Dr. Stevens, Ms. Hallwood, and/or Grove School breached the standard of care by, *inter alia*, allowing M.F. to be admitted and/or remain admitted to the residential program at Grove School.

156.    Dr. Stevens, Ms. Hallwood, and/or Grove School should not have allowed M.F. to be admitted to Grove School because of her history of absconding and self-injurious behavior from prior in-patient programs. Per the program description of Grove School, M.F.'s symptoms were too acute for her to safely be managed at Grove School and the program description indicated that a reason for exclusion was self-injury and absconding.

157.    Dr. Stevens, Ms. Hallwood, and/or Grove School should not have allowed M.F. to remain admitted to Grove School. During her time at Grove School, M.F. was exhibiting severe psychiatric symptoms and was utilizing as-needed medications for symptoms of anxiety, depression, and psychosis.  She endorsed suicidal ideation to the treatment team, including Dr. Stevens and Ms. Hallwood, and had instances of severely concerning behavior including

standing on tables, walking out of supervision, and open discussion of suicide with a plan to kill herself by getting hit by a train.

158.    The level of observation offered at Grove School was not adequate to prevent M.F. from completing this plan, a fact which was known, or should have been known, by Dr. Stevens, Ms. Hallwood, and/or Grove School. Admitting M.F. to the residential program at Grove School and/or allowing M.F. to remain admitted to Grove School was a breach of the standard of care.

159.    Regardless of the documented levels of observation available at Grove School, given what Dr. Stevens, Ms. Hallwood, and/or Grove School knew about M.F. and her history, the services Dr. Stevens, Ms. Hallwood, and/or Grove School provided to M.F. did not meet the standard of care. As discussed above, M.F. had a significant history of, *inter alia*, absconding, self-injury, and suicide attempts, all of which these defendants knew.  She reported plans of all of these and engaged in risky, deteriorating behavior during her short time at Grove School.

160.    Less than 24 hours before M.F.'s suicide, Dr. Stevens, Ms. Hallwood, and/or Grove School placed M.F. on a higher level of observation ("Escorted Supervision"). However, in breach of the standard of care, this level of supervision did not ensure that M.F. would be under constant supervision and observation, including overnight.

161.    Despite Dr. Stevens and Ms. Hallwood's recurrent documented concerns regarding M.F.'s risk of suicide, Dr. Stevens, Ms. Hallwood, and/or Grove School did not take appropriate actions to increase M.F.'s safety.

162.    In addition to the above, Ms. Hallwood and/or Grove School breached the standard of care in the in the following ways, among others:

    a.   Ms. Hallwood noted upon her intake with M.F. her concerns about M.F.'s

"ability to stay safe on campus" but neither she nor Grove School took

clinically appropriate actions to assess or plan for M.F.'s safety.

b.   Despite M.F.'s continued risk for suicide throughout her stay at Grove

School, Ms. Hallwood and/or Grove School did not take clinically

appropriate actions to conduct ongoing assessments or plans for M.F.'s

safety.

c.   Ms. Hallwood and/or Grove School did not create or implement

treatment goals to plan for M.F.'s treatment and care.

d.   Ms. Hallwood and/or Grove School did not adequately coordinate care with

outside providers to assess or plan for M.F.'s safety.

e.   Ms. Hallwood and/or Grove School did not provide evidence-based

treatment modalities.

f.   Ms. Hallwood and/or Grove School did not document any notification

to M.F.'s parents regarding her risk of suicide.

g.   Ms. Hallwood and/or Grove School did not follow standard practices in the

identification, assessment, or planning of suicide risk in the case of M.F.'s

death by suicide or utilize any standard validated tools to screen, assess, or

plan for M.F.'s safety.

163.   Dr. Stevens, Ms. Hallwood, and/or Grove School's failure to render adequate care

and treatment proximately caused M.F.'s death.

164.   As a direct result of Dr. Stevens, Ms. Hallwood, and/or Grove School's

breaches of the standard of care, M.F. died on May 20, 2021.

165.   At the time of her death, M.F. was fifteen years old, in good health, and

had a normal life expectancy of over sixty more years. As a result of her death, M.F.'s

ability to engage in and enjoy her normal life's activities for the remainder of her normal

life expectancy was destroyed.

166.    As a further result of her death, M.F.'s future earning capacity was

destroyed.

167.    As a result of M.F.'s death, her Estate incurred funeral expenses.

168.    Defendants Amy Stevens, M.D.; Sara Hallwood, LCSW; and Grove

School are liable to the Estate of M.F. for her wrongful death and damages caused by their

negligence and the negligence of their administrators, counselors, and other staff.

## COUNT V

**Wrongful Death - Violation of the Connecticut Unfair Trade Practices Act**

**Defendants Grove School, Richard Chorney, and Peter Chorney**

**(Conn. Gen. Stat. § 42-110g; Conn. Gen. Stat. § 52-599, Conn. Gen. Stat. § 52-555)**

169.    Paragraphs 1-168 are incorporated herein by reference as though fully set forth

herein.

170.    Under the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. §

42-110a, *et seq*., "[n]o person shall engage in unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-

110b.

171.    Grove School is a "person" within the meaning of CUTPA. *See* Conn. Gen. Stat.

§ 42-110a(3) (defining "person" to include "corporation, limited liability company, trust,

partnership, incorporated or unincorporated association, and any other legal entity"). For the

same reason, Richard and Peter Chorney are also subject to CUTPA.

172.    Grove School, P. Chorney, and/or R. Chorney engaged in "trade" and "commerce" within the meaning of CUTPA by advertising and offering a variety of academic, residential, clinical, and other services. *See* Conn. Gen. Stat. § 42-110a(4).

173.    Grove School charged an annual residential student tuition of $144,000.00 for its services.

174.    Grove School, P. Chorney, and/or R. Chorney knew, or should have known, that Grove School was unable to meet the staffing levels described in Grove School's advertising and informational documents, including the Handbook.

175.    Grove School, P. Chorney, and/or R. Chorney engaged in unfair methods of competition and unfair or deceptive acts or practices by advertising and claiming to provide certain levels of staffing and supervision which in fact it did not provide and was incapable of providing.

176.    Distinct from the above negligence and malpractice claims, Grove School, P. Chorney, and/or R. Chorney's unethical business practice of misrepresenting Grove School's staffing levels and supervision of students is an entrepreneurial or business aspect of the services rendered.

177.    Specifically, Grove School, P. Chorney, and/or R. Chorney claimed to offer the following:

   a.   Security staff who would monitor the campus *at all times*;

   b.   An awake night watch staff member assigned to each of the girls' dorms;

   c.   The ability to provide students with "direct supervision of a 24 hour overnight awake staff" member.

178.    However, due to severe and long-running short-staffing issues:

a.  Security staff were unable to monitor the campus at all times as the staff member assigned to monitor the security camera equipment located in the Welcome Center was *also* responsible for conducting the bed checks for all *six* of the boys' dorms.

b.  Rather than each of the girls' dorms being assigned an awake night watch staff member, these staff members were assigned *three* separate dorms.

c.  Grove School night staff were unable to directly supervise students 24-hours a day as they all were responsible for monitoring multiple dorms.

179.   Grove School, by and through its employees and/or agents, made representations to the Parents on May 19, 2021, that M.F. would be monitored *at all times*, knowing, or having should have known, that this was false.

180.   The Parents reasonably relied on Grove School, P. Chorney, and/or R. Chorney's representations in choosing to enroll M.F., and maintain her enrollment, in Grove School's residential program.

181.   Grove School, P. Chorney, and/or R. Chorney's use of unfair and deceptive trade practices services proximately caused M.F.'s death.

182.   Grove School, P. Chorney, and/or R. Chorney's trade practice of misrepresenting the nature of the services it provides offends public policy, is unethical, and causes substantial injury to consumers: in this case, it cost M.F. her life.

183.   Grove School, P. Chorney, and/or R. Chorney demonstrated a reckless disregard for M.F.'s rights and wellbeing by advertising and claiming to provide specific services, tailored to adolescents like M.F., while being wholly incapable of providing said services.

184.    For reasons of public policy, businesses, including Grove School, should be deterred from advertising services which the business knows, or reasonably should know, it does not provide and is incapable of providing. This policy consideration is crucial in the case of "therapeutic boarding schools," which have considerable control over the wellbeing of exceptionally vulnerable adolescents.

185.    At the time of her death, M.F. was fifteen years old, in good health, and had a normal life expectancy of over sixty more years. As a result of her death, M.F.'s ability to engage in and enjoy her normal life's activities for the remainder of her normal life expectancy was destroyed.

186.    As a further result of her death, M.F.'s future earning capacity was destroyed.

187.    As a result of M.F.'s death, her Estate incurred funeral expenses.

188.    Defendants Grove School, Peter Chorney, and Richard Chorney are liable to the Estate of M.F. for her wrongful death and damages caused by their unfair trade practices and the unfair trade practices of their administrators, counselors, and other staff, including costs and reasonable attorney's fees under Conn. Gen. Stat. § 42-110g(d). Plaintiffs also seek punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

**WHEREFORE**, Plaintiffs respectfully request entry of judgments against Defendants in the amount of $50,000,000, plus pre – and post – judgment interest at the legal rate, all taxable costs expended in connection with this action, and such other relief as this Court deems proper.

<u>**JURY DEMAND**</u>

Plaintiffs demand trial by jury on any issue raised by this Complaint to the fullest extent available under the law.

Respectfully submitted,

GABRIELLE ALFANO FONTANA and

JOSEPH GABRIEL FONTANA,

as Co-Administrators of the Estate of M.F.

By:

/s Peter C. Grenier
Peter C. Grenier (*Pro Hac Vice application to be filed*)
**GRENIER LAW GROUP PLLC**
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
(202) 768-9600 (telephone)
pgrenier@grenierlawgroup.com
*Counsel for Plaintiffs*

-and-

/s Daniel M. Cappelletti
Daniel M. Cappelletti (*Pro Hac Vice application to be filed*)
**GRENIER LAW GROUP PLLC**
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
(202) 768-9600 (telephone)
dcappelletti@grenierlawgroup.com
*Counsel for Plaintiffs*

-and-

/s James J. Healy
James J. Healy (CT28447)
**COWDERY & MURPHY, LLC**
280 Trumbull Street, 22nd Floor
Hartford, CT 06103
(860) 278-5555 (telephone)
jhealy@cowderymurphy.com
*Counsel for Plaintiffs*